IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BULLDOG NATIONAL RISK RETENTION GROUP, INC. f/k/a AMERICAN TRANSPORTATION INSURANCE RISK RETENTION GROUP | : | CIVIL ACTION |
| v. | : | |
| GB GROUP, LLC | : | NO. 25-3717 |

**MEMORANDUM**

**Padova, J.** **July 29, 2026**

Plaintiff Bulldog National Risk Retention Group, Inc. ("Bulldog") commenced this breach of contract action against Defendant GB Group, LLC, alleging that GB Group breached an agreement pursuant to which it provided claims handling services to Bulldog. GB Group has moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Bulldog opposes the Motion. For the reasons that follow, we grant the Motion insofar as it seeks dismissal of the breach of contract, breach of fiduciary duty, and negligence claims, but we deny the Motion insofar as it seeks dismissal of the claim for breach of the implied covenant of good faith and fair dealing.

## I. BACKGROUND

The First Amended Complaint (the "Complaint") alleges that Bulldog is a North Carolina risk retention group that is "in the business of providing commercial automobile liability insurance to long-haul and other" truck drivers. (Compl. ¶¶ 3, 8.) GB Group is "in the business of providing

[1] The title of GB Group's Motion also references Rules 12(b)(3) and 13(a), but the Memorandum in Support of the Motion frames GB Group's arguments as arising under Rule 12(b)(6) and then cryptically adds in footnote that "[t]o the extent necessary, GB Group alternatively brings these dismissals bases pursuant to their own individual self-executing legal bases, Rule 12(b)(3), or Rule 13(a)." (GB Grp. Mem. at 13 n.7.) We follow GB Group's lead and treat the Motion primarily as one pursuant to Rule 12(b)(6).

third-party administrative services to property and casualty insurers like Bulldog." (Id. ¶ 10.) On July 2, 2018, Bulldog's corporate predecessor, American Transportation Group Insurance Risk Retention Group ("ATGI"), entered into a "Service Agreement" with GB Group (the "Agreement"), pursuant to which GB Group agreed to provide Bulldog with third-party administrative/claims handling services. (Id. ¶¶ 1, 11.) GB Group terminated the Agreement on October 1, 2021, but has continued to perform services for Bulldog in connection with claims that existed at the time of the termination and continues to be compensated for those services. (Id. ¶¶ 14-15.)

Among the services the Agreement requires GB Group to provide are the following:

> A. Manage all claims by all persons or corporations submitted by [Bulldog] to [GB Group].
>
> * * * *
>
> F. Perform all reasonable and necessary administrative and clerical work in conjunction with each claim, including the preparation and execution of payments, release agreements and other documents necessary to process a claim.
>
> G. Coordinate all litigation activity with designated outside legal counsel, as approved by [Bulldog].

(Id. ¶ 12 (quoting Agrmt., Compl. Ex. A, Art. II, §§ A, F-G).) Pursuant to these provisions, GB Group has many responsibilities, including "to appropriately document the life cycle of a claim, and to communicate and correspond" with Bulldog. (Id. ¶ 18.) It is also responsible for sending "reservation of rights" letters to claimants when it is unclear whether Bulldog's coverage would include the "entire dispute or issue presented to the carrier." (Id. ¶ 22.) GB Group also has responsibility for evaluating (and advising Bulldog) whether coverage is appropriate, issuing denial letters to insureds when there is no coverage, retaining and overseeing outside defense

counsel, and "coordinating with [the carrier and counsel] over strategy, settlement, and case decisions." (Id. ¶¶ 27-28, 35.)

According to the Complaint, "GB Group has repeatedly failed to execute as expected and required under the Agreement, industry standard and as expected based on custom and practice." (Id. ¶ 13.) It "not only failed to communicate with Bulldog," but also either failed "to document the life of dozens of claims" or deleted its files for those claims. (Id. ¶ 19.) In addition, it "repeatedly and routinely failed to issue reservation of rights letters where it would have been necessary and appropriate to do so," "repeatedly failed to timely issue denial letters," "failed to issue denial letters in the normal course of business" and instead retained coverage counsel, "eroding the reserves and capital for the entire insurance program." (Id. ¶¶ 24, 31-32.) Continually, and continuing to the present day, GB Group has also failed to adjust claims in an efficient and cost-effective manner, neglecting its responsibilities to "manage claims, perform reasonable and necessary clerical work, and coordinate litigation activity" in accordance with the Agreement and industry standards. (Id. ¶¶ 35-36, 51.) More specifically, the Complaint alleges that GB Group failed to (and continues to fail to) retain experienced and reasonably-priced defense counsel, coordinate with defense counsel about defense strategies and resolution of disputes, engage in proper oversight of counsel, provide Bulldog and counsel with necessary and timely information and recommendations, timely pay claims, reconcile trust accounts, timely respond to regulators and auditors, and set adequate reserves. (Id. ¶¶ 37-47, 51.) GB Group has refused outright to discuss claims with Bulldog outside of email communications on numerous occasions, refused to communicate with certain members of Bulldog's team, and routinely failed to attend mediations. (Id. ¶¶ 48-50.)

Article II, Section J of the Agreement also requires GB Group to provide loss run reports. (Id. ¶ 54.) Bulldog still relies on GB Group's loss runs for active claims. (Id. ¶ 55.) According to the Complaint, GB Group has consistently failed in its obligation to provide loss runs, and has paid insufficient attention to the loss runs, resulting in millions of dollars of reserves being maintained on claims that should have been marked closed and causing Bulldog to provide inaccurate data to its actuary and regulators. (Id. ¶¶ 56-57, 59.) By way of example, the Complaint alleges that the May 31, 2025 loss run report listed 88 files as "open," while the June 30, 2025 report showed each of those files as "closed." (Id. ¶¶ 60-61.) The change in reporting was not due to all 88 files having been resolved within the one-month period between reports, but rather was the result of GB Group taking a close look at the report and realizing that many of the files had been closed "years earlier"; indeed, only one had been closed in June of 2025. (Id. ¶¶ 62, 68.) The "88 files were closed with a total incurred loss of $8.016 million, and Bulldog's loss was reduced by $3.356 million." (Id. ¶ 64.) Because these files were not closed in a timely fashion, Bulldog kept millions of dollars in reserves on the books, when that capital could have been deployed elsewhere. (Id. ¶ 65.) The shift will also require Bulldog to revise prior quarters' disclosures, which will be a "heavy lift." (Id. ¶ 66.)

The Complaint details GB Group's contractual failures in connection with just one particular case in Louisiana state court, Martinez v. ATGI, which involved a motor vehicle accident. (Id. ¶¶ 73, 79.) Before that case was initiated, GB Group received from the plaintiffs a preservation and spoliation letter, which GB Group failed to provide to either defense counsel or Bulldog's insured, Star Carriers. (Id. ¶¶ 75, 77-78.) As a result, Star Carriers failed to retain certain evidence. (Id. ¶ 85.) At trial, the court permitted the Martinez plaintiffs to testify about the preservation letter, which was highly prejudicial. (Id. ¶¶ 87-89.) On February 10, 2023, the

jury returned a verdict against Star Carrier, its driver, and Bulldog (then ATGI) in an amount of $2,403,994.88, which was in excess of Star Carrier's policy limit of $1,000,000. (Id. ¶ 89.) Thereafter, the Martinez plaintiffs threatened to file a lawsuit against Bulldog for failing to settle within policy limits and seeking the full amount of the judgment. (Id. ¶ 94.) In January of 2025, Bulldog settled with the Martinez plaintiffs for far more than it should have had to pay. (Id. ¶ 95.)

The Complaint contains four Counts. Count I asserts a breach of contract claim. Count II asserts a claim for breach of the implied covenant of good faith and fair dealing. Count III asserts a claim for breach of fiduciary duty. Count IV asserts a claim for negligence. All four Counts are grounded on allegations that GB Group "breached Article II, §§ A, F-G, J of the Agreement by . . . failing to issue reservation of rights letters, failing to follow defense counsel recommendations, failing to properly manage claims and coordinate litigation activity and failing to decline and/or disclaim coverage." (Id. ¶¶ 107, 118, 127, 134.)

## II. LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). We "accept[] all well-pleaded allegations in the complaint as true and view[] them in the light most favorable to the plaintiff." Talley v. Pillai, 116 F.4th 200, 206 (3d Cir. 2024 (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). However, we "need not 'accept as true a legal conclusion couched as a factual allegation.'" Host Int'l, Inc. v. MarketPlace PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (citation omitted).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," which "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (second alteration in original) (first quoting Fed. R. Civ. P. 8(a)(2); then quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The complaint must allege "sufficient factual matter to show that the claim is facially plausible." Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Kalu v. Spaulding, 113 F.4th 311, 325 (3d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). Under this standard, a complaint need not plead all of the facts necessary to prove each element of the plaintiff's claims; it "need only allege enough facts to 'raise a reasonable expectation that discovery will reveal evidence of [each] necessary element.'" Martinez v. UPMC Susquehanna, 986 F.3d 261, 266 (3d Cir. 2021) (alteration in original) (quoting Fowler, 578 F.3d at 213). In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555).

## III. DISCUSSION

GB Group moves to dismiss all four Counts of the Complaint pursuant to Rules 12(b)(6) for several different reasons. First, it argues that this action should be dismissed or stayed pursuant to the First-Filed Rule because the parties were already engaged in breach of contract litigation in

the United States District Court for the Eastern District of North Carolina before the instant action was filed. Second, it argues that the claims asserted in the instant action were compulsory counterclaims in the North Carolina litigation and thus, cannot be asserted here. Third, it argues that Bulldog's claims are barred by the statute of limitations. And finally, it argues that each of the claims, individually, fails as a matter of law.

**A. First-Filed Rule**

GB Group first argues that we should dismiss or stay this action pursuant to the First-Filed Rule because, at the time the instant action was filed on July 18, 2025, and when GB Group filed its Motion, there was a second breach of contract action pending between the parties in the Easten District of North Carolina. See GB Grp., LLC v. Bulldog Nat'l Risk Retention Grp., Inc., Civ. A. No. 5:23-00029-BO-RN (E.D.N.C.) (GB v. Bulldog, or the "NC Action"). Under the First-Filed Rule, we have discretion to dismiss without prejudice or stay an action when there are "proceedings involving the same parties and the same issues already before another district court." E.E.O.C. v. Univ. of Pennsylvania, 850 F.2d 969, 971 (3d Cir. 1988) (citation omitted), aff'd, 493 U.S. 182 (1990); Chavez v. Dole Food Co., 836 F.3d 205, 220-21 (3d Cir. 2016) (stating that a "dismissal with prejudice" pursuant to the First-Filed Rule will "almost always be an abuse of the court's discretion). The purpose of the rule is to "encourage[] sound judicial administration and promote[] comity among federal courts of equal rank." E.E.O.C., 850 F.2d at 971.

Here, the docket in the NC Action reflects that the parties stipulated to dismissal with prejudice of all claims in that action on March 13, 2026, and that case is now closed.[2] (Stip. of

[2] Bulldog informally wrote to the Court on March 17, 2026, to advise us, inter alia, that the NC Action had settled, and it took that opportunity to argue, outside of the pleadings, that certain of GB Group's arguments in its Motion to Dismiss were now moot. GB Group then wrote a responsive letter, in which it objected to any docketing of Bulldog's letter, arguing that the letter was an improper attempt to reopen briefing on the Motion to Dismiss. Because we have no

Dismissal, Docket No. 109, GB v. Bulldog, No. 5:23-cv-00029-BO-RN (E.D.N.C. March 13, 2026).) Accordingly, there is no longer any reasoned basis to either stay this case or dismiss it without prejudice to permit the issues raised here to be resolved in the NC Action. We therefore deny GB Group's Motion to the extent it seeks dismissal or a stay pursuant to the First-Filed Rule.

**B. Compulsory Counterclaim Rule**

GB Group next argues that we should dismiss the instant action because the claims that Bulldog brings here were compulsory counterclaims in the NC Action and thus, Bulldog is now barred from bringing those claims in this action.

GB Group commenced the NC Action against Bulldog's predecessor, ATGI, along with ATGI's president, treasurer, and corporate manager (the "Bulldog Defendants"), in 2021.[3] (See Complaint, Docket No. 1, GB v. Bulldog, No. 5:23-cv-00029-BO-RN (E.D.N.C. Jul. 15, 2021).) In that action, which concerned the same Agreement at issue in the instant case, GB Group asserted claims for, inter alia, breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, and for an accounting, asserting that the Bulldog Defendants had failed to pay GB Group's service fees or provide GB Group with the information necessary to calculate its fees. GB Grp., LLC v. Bulldog Nat'l Risk Retention Grp., Inc., No. 5:23-cv-00029-BO, 2023 WL

---

difficulty understanding the import of the developments in the NC Action, and because the parties had ample opportunity to brief the issues raised in GB Group's Motion, we chose not to docket the parties' letters and to instead decide the Motion on the already extensive briefing and the public record in the NC Action.

[3] Notably, GB Group initially filed the NC Action in the Eastern District of Pennsylvania on July 15, 2021, and filed an Amended Complaint in this Court on October 15, 2021. Thereafter, the Bulldog Defendants moved to dismiss the Amended Complaint for lack of personal jurisdiction, forum non conveniens, and failure to state a claim. On November 28, 2022, the Honorable Joshua D. Wolson granted that motion in part, transferring the case to the Eastern District of North Carolina pursuant to 28 U.S.C. § 1404. (Transfer Ord., Docket No. 24, GB v. Bulldog, No. 5:23-cv-0002-BO-RN (E.D.N.C. Nov. 28, 2022).)

9514088, at *2 (E.D.N.C. Dec. 27, 2023) ("GB v. Bulldog I"). Bulldog filed counterclaims for, inter alia, breach of the implied covenant of good faith and fair dealing. Id. Bulldog alleged in those counterclaims that GB Group had breached its obligations under the Agreement by misrepresenting its qualifications and charging service fees that were not standard in the industry. Id. at *3. It further alleged that GB Group had violated the Agreement's confidentiality provision by improperly accessing Bulldog's underwriting and premium information associated with claims not covered by the Agreement and then improperly sharing that information with Bulldog's competitors. Id.

At the motion to dismiss stage, the North Carolina court dismissed Bulldog's counterclaims regarding GB Group's fees, concluding that the claims "r[an] headfirst" into the Agreement's provisions, which set the service fees without reference to industry custom or GB Group's experience level. Id. at *3. Later, at summary judgment, the North Carolina court granted judgment in GB Group's favor on Bulldog's claim concerning the Agreement's confidentiality provision, finding that the record contained no evidence that GB Group had ever improperly disclosed Bulldog's claims information. GB Grp., LLC v. Bulldog Nat'l Risk Retention Grp., Inc., No. 5:23-cv-00029-BO, 2026 WL 64109, at *5 (E.D.N.C. Jan. 8, 2026) ("GB v. Bulldog II"). Thereafter, the parties settled the only claims that remained, which were "GB Group's breach of contract claim against Bulldog, GB Group's claim for breach of the implied duty of good faith and fair dealing against all defendants, and its claim for an accounting," and the case was closed. Id. at *7; (Jt. Stip. of Dism. with Prej., Docket No. 109, GB v. Bulldog, No. 5:23-cv-00029-BO-RN (E.D.N.C. Mar. 13, 2026)).

As stated above, GB Group argues that the claims that Bulldog asserts in the instant action were compulsory counterclaims in the NC Action and thus, cannot now be asserted in this case.

Federal Rule of Civil Procedure 13(a)(1), which concerns compulsory counterclaims, provides that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . and does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1). Of primary importance in this case is whether Bulldog's claims here "arise[] out of the transaction or occurrence that [was] the subject matter of [GB Group's] claim[s]" in the NC Action. Id. Bulldog also emphasizes that embedded in the Rule's language that a pleader need only plead counterclaims available "at the time of service" is the limitation that a counterclaim is not compulsory if it "has not matured at the time the [defendant] serves [its answer]." 6 Wright & Miller's Federal Practice & Procedure § 1411 (3d. ed. 2010). Ultimately, identifying a counterclaim as compulsory is of critical significance because "if a defendant fails to bring [a] compulsory counterclaim, he is barred from doing so in subsequent actions." Insignia Disposal Servs., LLC v. Hrebenar, 697 F. Supp. 3d 370, 375 (E.D. Pa. 2023) (citing Transamerica Occidental Life Ins. Co. v. Aviation Off. of Am., Inc., 292 F.3d 384, 390-93 (3d Cir. 2002); see also Xerox Corp. v. SCM Corp., 576 F.2d 1057, 1059 (3d Cir. 1978) ("[T]he doctrine of res judicata compels the counterclaimant to assert his claim in the same suit for it would be barred if asserted separately, subsequently." (quoting Great Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d 631, 634 (3d Cir. 1961)).

The United States Court of Appeals for the Third Circuit has stated that a counterclaim should only be deemed to have "arise[n] out of the transaction or occurrence that is the subject matter of the opposing party's claim," id., if it "bears a logical relationship to [the] opposing party's

claim." Transamerica, 292 F.3d at 389 (quoting Xerox Corp., 576 F.2d at 1059).[4] The term "[l]ogical relationship" should be "construed generously" to further Rule 13(a)'s purpose of promoting judicial economy. Id. at 390. Thus, a court should find a "logical relationship" to exist where individual trials for a claim and counterclaim would cause a "substantial duplication of effort and time by the parties and the courts." Id. at 389-90 (quoting Xerox Corp., 576 F.2d 1059). "Such a duplication is likely to occur when claims involve the same factual issues, the same factual and legal issues, or are offshoots of the same basic controversy between the parties." Id. at 390 (citing Xerox, 576 F.2d at 1059) (additional citation omitted).

GB Group argues that the claims that Bulldog asserts here bear a "logical relationship" to Bulldog's claims against it in the NC Action because both sets of claims concern the parties'

---

[4] Bulldog argues that we should not be applying Third Circuit law to resolve the compulsory counterclaim issue but, instead, should be applying federal law as articulated by the Fourth Circuit, where the NC Action was venued. However, we find no material difference between the law in the two Circuits. The United States Court of Appeals Fourth Circuit has identified "four 'inquiries' as guiding [its] determination" as to whether a claim and counterclaim concern the same "transaction or occurrence." Equitrans, L.P. v. Moore, 725 F. App'x. 221, 224 (4th Cir. 2018) (quoting Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 219 (4th Cir. 2006)). They are:

> (1) whether the issues of fact and law in the claim and counterclaim are essentially the same; (2) whether *res judicata* would bar a subsequent suit on the counterclaim absent the compulsory counterclaim rule; (3) whether the same evidence would support or refute the claim and the counterclaim; and (4) whether there is a logical relationship between the claim and counterclaim.

Id. (quoting Q Int'l Courier, 441 F.3d at 219). Critically, the Fourth Circuit has stated that a court "need not answer all [four] questions in the affirmative for the counterclaim to be compulsory because the inquiries are less a litmus, more a guideline." Id. at 224 (quotation omitted). We thus understand these four inquiries to be the same as those that ultimately guide the "transaction or occurrence" analysis in the Third Circuit. See Transamerica, 292 F.3d at 389, 391 (stating that the court considers whether there is a logical relationship between the claim and counterclaim, whether the issues of fact and law are the same or "offshoots of the same basic controversy," and whether separate trials on the claims would require duplication of effort and time, and also observing that the "scope of the doctrine and its rationale are the same as those of [res judicata]"). Accordingly, we have no hesitation referring to the familiar law in this Circuit, rather than the Fourth Circuit's articulation of that law, in order to resolve the issue.

obligations under the Agreement and their conduct within the contractual relationship. More specifically, it argues that because it sought to be paid for the services it had provided to Bulldog in the NC Action and Bulldog claims in the instant action that GB Group's provision of those services did not comply with the terms of the Agreement, there is simply no denying that the claims are logically related to one another. (GB Reply Br. at 8 (stating the issues of fact and law in the two cases are essentially the same as the NC Action asks whether "GB Group [is] due money for the services it provided," and this action asks whether Bulldog "is . . . due money for services GB Group allegedly failed to provide").) GB Group acknowledges that Bulldog now alleges additional facts and circumstances to support its contractual claims, but it maintains that the new material is inconsequential to the compulsory counterclaim analysis, which only requires that the claims "involve many of the same factual issues," not that all of the factual issues be identical. Xerox Corp., 576 F.2d at 1059 (emphasis added) (quotation omitted); Transamerica, 292 F.3d at 389 ("[T]here need not be precise identity of issues and facts between the claim and the counterclaim." (citing Xerox Corp., 576 F.2d at 1059)).

Bulldog responds that the two actions do not involve the same transaction or occurrence, arguing that (1) there are no common issues of fact or law between the two actions, (2) evidence in the instant case will be different than that in the NC Action because this action, unlike the NC Action, concerns GB Group's performance of its affirmative duties under the Agreement, and (3) res judicata would not bar its claims in this action because the claims arise from GB Group's wrongdoing that continues to the present day. It also argues that its current claims were not compulsory counterclaims in the NC Action because they were not "mature" when its answer was due in the NC Action, i.e., on March 14, 2023.

With regard to the "maturation" of Bulldog's claims, GB Group acknowledges that there are allegations in the Complaint about events that occurred after Bulldog's answer was due in the NC Action, because events are alleged to have occurred "before and after March 2023" (Am. Compl. ¶ 17), in January of 2025 (id. ¶ 95), on May 31, 2025 (id. ¶¶ 60, 63), on June 30, 2025 (id. ¶ 61), and in July of 2025 (id. ¶ 69). However, GB Group insists that these facts could have been explored in discovery in the NC Action, which did not close until June 18, 2025, or addressed in summary judgment motions, which were filed on July 18, 2025. In addition, to the extent that Bulldog alleges that GB Group's breaches continue "to present day" (id. ¶¶ 51, 99,108, 117, 126), GB Group maintains that Bulldog could have moved pursuant to Rule 15(d) to supplement its pleadings to address any such events. See Fed. R. Civ. P. 15(d) (giving court discretion to permit a party to supplement its pleadings with events that happened after the date of the pleading to be supplemented). It therefore urges us to reject Bulldog's argument that its claims were not compulsory because they were not mature at an appropriate time in the NC Action.

Upon consideration of the parties' arguments, we reject GB Group's argument that Bulldog's claims in this case were compulsory counterclaims in the NC Action. We simply are not convinced that Bulldog's claims are logically related to the claims that GB Group asserted against Bulldog in the NC Action, or were mature at the pertinent time, i.e., when Bulldog's North Carolina answer was due. Although both actions contain claims for breach of the Agreement, Bulldog's claims here address a different time frame, different provisions of the Agreement, and different conduct. Indeed, Bulldog's claims in this case are not framed as countering GB Group's claimed right to payment for its services in the time frame covered by the NC Action. Rather, the current claims, as we understand them, concern certain services rendered after the services for which GB Group sought payment in North Carolina and, in any event, do not question GB Group's

right to payment under the Agreement but rather, seek damages that Bulldog allegedly suffered as a byproduct of GB Group's noncompliance with its contractual obligations. It also seems plain that the facts and legal issues required to determine in this case whether GB Group properly performed its administrative and claims management obligations under the Agreement are simply not the same as those required to ascertain in the NC Action whether GB Group was appropriately paid for its services under the Agreement's fee schedule and/or whether Bulldog provided it the information necessary to calculate its fees. Moreover, we find the facts and issues in the instant case to be sufficiently distinct that we do not consider them to be "offshoots of the same basic controversy between the parties." Transamerica, 292 F.3d at 390 (citations omitted).

In sum, we simply cannot conclude at this stage of the proceedings that Bulldog's 2025 claims that GB Group has failed to comply with its obligations under the Agreement risk "substantial duplication of effort and time by the parties and the courts."[5] Transamerica, 292 F.3d at 390 (quoting Xerox Corp. 576 F.2d at 1059). We therefore decline to dismiss this case pursuant to Rule 12(b)(6) and the Compulsory Counterclaim Rule and deny GB Group's Motion insofar as it asks us to do so.

### C. Statute of Limitations

GB Group also argues that all of Bulldog's claims are barred by North Carolina law's three-year statutes of limitations.[6] See N.C. Gen. Stat. §§ 1-52(1), (5); Ussery v. Branch Banking & Tr.

[5] We acknowledge that our rejection of GB Group's compulsory counterclaim argument may trigger discovery on top of the prolonged and significant discovery already completed in the NC Action. However, our dismissal of many of Bulldog's claims in this action and enforcement of North Carolina's statute of limitations will ensure that any such discovery is circumscribed and not meaningfully duplicative of the discovery previously completed.

[6] The parties are in agreement that North Carolina substantive law applies because the Agreement includes a choice of law provision, which states that that the Agreement's "construction and enforcement" and "the interpretation of the rights and duties of the parties shall

Co., 777 S.E.2d 272, 277 n.5 (N.C. 2015) (citation omitted). It reasons that this case was commenced on July 19, 2025, and the Complaint alleges no discrete breaches of duties that occurred after July 19, 2022, that is, within the three years prior. Bulldog argues in opposition that North Carolina's "continuing wrong doctrine" saves its claims from the statutes of limitations' time-bars.

A claim may be dismissed pursuant to Rule 12(b)(6) where "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (quoting Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002)). "Once the defendant raises a statute of limitations defense, the burden of showing that the action was instituted within the prescribed period is on the plaintiff." Birtha v. Stonemor, N. Carolina, LLC, 727 S.E.2d 1, 7 (N.C. Ct. App. 2012) (quoting Horton v. Carolina Medicorp, 472 S.E.2d 778, 780 (N.C. 1996)).

Under North Carolina law, "a cause or right of action accrues, so as to start the running of the statute of limitations, as soon as the right to institute and maintain a suit arises." Spoor v. Barth, 781 S.E.2d 627, 633 (N.C. Ct. App. 2016) (quoting Pierson v. Buyher, 409 S.E.2d 903, 905 (N.C. 1991)). Claims for breach of contract and breach of the duty of good faith and fair dealing accrue at the time of the breach. Id. (breach of contract) (citation omitted); Piles v. Allstate Ins. Co., 653 S.E.2d 181, 185-86 (N.C. Ct. App. 2007) (good faith and fair dealing). Similarly, "[a] cause of action based on negligence accrues when the wrong giving rise to the right to bring suit is committed." Birtha, 727 S.E.2d at 7 (quotation omitted).

---

be governed by the law of the State of North Carolina." (Agrmt., Compl. Ex. A, Art. VII(K)); see Baxter Healthcare Corp. v. B. Braun Med. Inc., Civ. A. No. 20-5659, 2022 WL 4133292, at *3 (E.D. Pa. Sept. 12, 2022) ("Pennsylvania courts give effect to choice of law provisions of a contract." (quotation and citation omitted)).

This case was commenced on July 19, 2025. Thus, pursuant to the applicable statutes of limitations, Bulldog's claims that accrued prior to July 19, 2022, are outside of the three-year limit. Here, the Complaint alleges that Bulldog's predecessor entered into the Agreement with GB Group in July of 2018, and that the Agreement was terminated on October 1, 2021, all of which is outside the limitations period. (Compl. ¶¶ 11, 14.) The Complaint also alleges, however, that the parties remained contractually bound for insurance claims that existed at the time of termination, "many of which remain active to this day." (Id. ¶ 15.) Given these allegations, we understand the allegations of breach and misconduct to span beyond July 19, 2022, and cannot conclude that "the time alleged in the statement of [the] claim" demonstrates that Bulldog's claims, as a whole, have not "been brought within the statute of limitations." Schmidt, 770 F.3d at 249.

Significantly, however, Bulldog does not argue that its claims as pled are not barred by the three-year statutes of limitations when those statutes are applied without exception. Rather, in arguing that its claims are timely, it invokes the North Carolina's continuing wrong doctrine, which is "an exception to the general rule that a claim accrues when the right to maintain a suit arises." Babb v. Graham, 660 S.E.2d 626, 637 (N.C. Ct. App. 2008) (citing Williams v. Blue Cross Blue Shield of N.C., 581 S.E.2d 415, 423 (N.C. 2003)). To take advantage of the continuing wrong doctrine, a "plaintiff must show a continuing violation by the defendant that is occasioned by continual unlawful acts." Birtha, 727 S.E.2d at 7 (quoting Marzec v. Nye, 690 S.E.2d 537, 542 (N.C. Ct. App. 2010)). It is not sufficient to plead "continual ill effects from an original violation." Id. (quoting Marzec, 690 S.E.2d at 542); see also ABL Plumbing & Heating Corp. v. Bladen Cnty. Bd. of Educ., 623 S.E.2d 57, 59 (N.C. Ct. App. 2005) ("Further damage incurred after the date of accrual is only an aggravation of the original injury and does not restart the statutory limitations period." (citation omitted)). Ultimately, when the continuing wrong doctrine is applied, the statute

of limitations "does not begin to run until the violative act ceases." Goines v. TitleMax of Va., No. 1:19CV489, 2023 WL 3332154, at *5 (M.D.N.C. May 9, 2023).

"Courts view continuing violations as falling into two narrow categories." Birtha, 727 S.E.2d at 7. The first is where "there is a longstanding policy of discrimination," and the second is when "there is a continually recurring violation." Id. (quoting Faulkenbury v. Teachers' & State Employees' Retirement Sys., 424 S.E.2d 420, 425 (N.C. Ct. App. 1993)). "As for the second category," which is the only one that potentially applies in the instant case, North Carolina "courts have used this exception narrowly," id., and when a party invokes it, the court considers "[t]he particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged," Babb, 660 S.E. 2d at 637 (quoting Williams, 581 S.E. 2d at 423).

In asserting that the continuing wrong doctrine applies here to save any otherwise untimely claims, Bulldog points to the Complaint's allegations that GB Group's wrongful conduct—namely, "failure to manage claims, perform reasonable and necessary administrative and clerical work for each claim, coordinate litigation activity, and properly maintain and update records, including loss run reports"—continue to the present day. (Bulldog Mem. at 21 (citing Compl. ¶¶ 51, 55, 56, 99, 108, 117, 126).) Thus, Bulldog is essentially asking us to find that it had no deadline to bring any claims against GB Group (and indeed, still has no deadline) because GB Group has been routinely violating the terms of the Agreement in a variety of ways over a course of years. We can find no support for this argument in North Carolina caselaw.

Bulldog argues that its situation is comparable to that of the plaintiffs in two North Carolina cases in which the court found the continuing wrong doctrine to save claims from a time-bar: Babb v. Graham, and Thomas v. Bragg Cmtys. LLC, No. 5:22-cv-226-D, 2023 WL 219337 (E.D.N.C. Jan. 17, 2023). In Babb, a trustee allegedly engaged in a singular pattern of defined misconduct—

failure to make distributions—and the court stated in dicta that if a three-year statute of limitations applied, it would not begin run on the plaintiff's breach of fiduciary duty claim grounded on this "continuous[] refus[al] to make distributions" until the trustee's removal.[7] Babb, 660 S.E. 2d at 637. In Thomas, the court relied on the dicta in Babb (erroneously calling it a holding) and found, on a motion to dismiss, that the three-year statute of limitations did not bar the plaintiffs' claim that the defendants engaged in a single type of recurring contractual breach—failure to ensure timely maintenance of the plaintiffs' residence—because the defendants' alleged consistent failure to make timely repairs was a continuing wrong that prevented the statute from running until the plaintiffs vacated the residence. Id. at *5.

We must abide by North Carolina's instruction to apply the continually recurring violation category of the continuing wrong doctrine narrowly, Birtha, 727 S.E.2d at 7, and cannot overlook that Babb's analysis is dicta and that Thomas follows that dicta, believing it to be a holding. Furthermore, even if Babb and Thomas were persuasive authority, neither supports a conclusion that vague allegations of a party's long-term and continuing wholesale abdication of multiple contractual duties, as Bulldog alleges here, are sufficient to implicate the continuing wrong doctrine to save otherwise untimely claims. We are also cognizant of North Carolina's instruction that "a 'continuing wrong' theory should not provide a means of relieving plaintiff from its duty of reasonable diligence in pursuing its claims." Ocean Acres Ltd. P'ship v. Dare Cnty. Bd. of Health, 707 F.2d 103, 107 (4th Cir. 1983). We thus conclude that Bulldog has failed to allege

[7] The Babb court's primary holding was that the plaintiff's breach of fiduciary duty claim was grounded in proven constructive fraud, which made it subject to a ten-year statute of limitations, within which the plaintiff's claims clearly fell. See Babb, 660 S.E. 2d at 637. It only addressed the continuing wrong doctrine as an alternative, "assuming, *arguendo*, that the claims for breach of fiduciary duty were [instead] governed by a three-year statute of limitations." Id.

facts that support a reasonable inference that claims that accrued prior to July 18, 2022 are nonetheless timely pursuant to the continuing wrong doctrine.[8] Birtha, 727 S.E.2d at 7 (denying plaintiffs' argument that claims are saved from a time-bar by the continuing wrong doctrine where the court "could find no case law, and Plaintiffs have presented no case law to suggest that the allegations here would amount to a continually recurring violation").

In sum, we reject Defendant's argument that the entire Complaint should be dismissed on statute of limitations grounds, and we deny its Motion insofar as it asks us to dismiss the Complaint in full on that basis. At the same time, we reject Bulldog's argument that its claims grounded on misconduct that falls outside of the three-year limitations period are timely under North Carolina's continuing wrong doctrine.

**D. Failure to State Claims as a Matter of Law**

Having rejected GB Group's arguments for wholesale dismissal of Bulldog's claims, we turn to its arguments that each claim, individually, fails as a matter of law.

1. Breach of Contract

GB Group argues that Bulldog's claim for breach of contract should be dismissed because the Complaint contains no plausible allegation of a breach that falls within the three-year statute of limitations window. As noted above, in order to state a claim upon which relief can be granted, a complaint must allege "sufficient factual matter to show that the claim is facially plausible,"

[8] Bulldog argues, alternatively, that any conclusion that the continuing wrong doctrine does not apply here would be premature because questions regarding the doctrine's applicability are fact-intensive inquiries that are inappropriate on a motion to dismiss. However, that argument presupposes a complaint that contains plausible allegations of a continuing course of misconduct. Here, there are only bald allegations that GB Group's misconduct is ongoing and "routine," without any accompanying factual allegations that make those assertions plausible. (See, e.g., Compl. ¶¶ 36, 39, 46, 50.) We therefore conclude that the Complaint does not suggest any factual basis for Bulldog's argument of a continuing violation that could potentially require further factual inquiry.

Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler, 578 F.3d at 210), and not merely "speculative," Geness, 974 F.3d at 269 (quotation omitted). Only by doing so does a plaintiff provide a defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (quoting Conley, 355 U.S. at 47). To state a breach of contact claim upon which relief can be granted under North Carolina law, a plaintiff must plausibly allege "(1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 530 S.E.2d 838, 843 (N.C. Ct. App. 2000). Here, the Complaint is filled with generalized allegations of ways in which GB Group breached the Agreement and alleges specific facts with regard to such claims in only two identifiable areas: (1) in connection with the Martinez action, and (2) with regard to GB Group's provision of loss reports.

Concerning the Martinez action, the Complaint alleges that GB Group failed to pass along to Bulldog's insured or the insured's defense counsel a preservation letter, which GB Group received from plaintiff's counsel before the action was initiated. (Compl. ¶¶ 73, 75, 77-78, 83, 105, 115, 124, 133.) The Complaint does not allege the date on which this alleged misconduct occurred. Instead, the only date it alleges in connection with the Martinez action is February 10, 2023, the date on which the Martinez trial concluded. (Id. ¶ 89.) Taking together the allegations that the breach occurred before the litigation commenced and the allegation that the trial concluded on February 10, 2023, the Complaint does not allow for a reasonable inference that the failure to pass along the preservation letter occurred after July 19, 2022. Thus, the factual allegations concerning the Martinez action do not support a claim for breach of contract that is timely under the applicable three-year statute of limitations.

The only other specific factual allegations of alleged misconduct concern GB Group's provision of loss run reports. In that regard, the Complaint alleges that GB Group produced

inaccurate loss run reports in May and June of 2025. (Compl. ¶¶ 60-61, 68-69.) However, the Complaint does not identify any provision of the Agreement that GB Group breached when it provided these two inaccurate reports. While it references Article II, § J of the Agreement, that provision states only that GB Group must "[p]rovide loss run reports," which GB Group plainly did when it produced the May and June reports. (Id. ¶ 54; Agrmt., Compl. Ex. A, at § II ¶ J.) We are therefore unable to discern any cognizable breach of contract claim arising from GB Group's provision of those reports.

Notably, Bulldog's only response to GB Group's argument that the Complaint fails to state a breach of contract claim upon which relief can be granted is to argue that it is not required to plead facts to support its claim, and that it is sufficient to plead the existence of an Agreement and the provisions of the Agreement that were breached. This argument, however, misunderstands the requirements of Twombly. While a complaint "does not need detailed factual allegations," it must include at least a modicum of facts that "nudge[] . . . claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570. Here, the Complaint alleges no such facts in connection with its breach of contract claims, except as set forth above in connection with the Martinez action and the loss run reports. We therefore grant GB Group's Motion insofar as it asks us to dismiss the breach of contract claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).[9]

---

[9] We acknowledge that Bulldog suggests that it should be excused from alleging factual support for its claims because the "the facts needed to more fully detail [its] claims are entirely in GB Group's custody, care, and control." (Bulldog Mem. at 29.) However, a defendant's exclusive possession of certain documents that would assist a plaintiff in fleshing out its claims does not relieve the plaintiff of its initial obligation to plead facts that give rise to more than a "sheer possibility that [the] defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citation omitted); see also id. at 678-79) (stating that the filing of a federal complaint "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). Here, as already stated,

2. Implied Covenant of Good Faith and Fair Dealing

GB Group argues that the Complaint fails to state a claim for breach of the implied covenant of good faith a fair dealing for two primary reasons: (1) the facts underlying the good faith and fair dealing claim are identical to those underlying the breach of contract claim; and (2) there are no allegations that support the wrongful intent element of a good faith and fair dealing claim.[10]

"Under North Carolina law, 'every contract [contains] an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefit of the agreement.'" GB v. Bulldog I, 2023 WL 9514088, at *3 (alteration in original) (quoting Bicycle Transit Auth., Inc. v. Bell, 333 S.E.2d 299, 305 (N.C. 1985)). Thus, "[i]n addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms." Maglione v. Aegis Family Health Ctrs., 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) (quotation omitted). Here, the Complaint alleges that GB Group breached the implied covenant of good faith and fair dealing by engaging in the exact same misconduct that allegedly breached the parties' contract. (Compare Compl. ¶¶ 104-108 with id. ¶¶ 114-118.)

GB Group argues that we must dismiss the good faith and fair dealing claim because North Carolina law only permits such claims that are grounded on gaps in contractual terms and here,

---

Bulldog alleges no facts that meet this standard except with regard to the Martinez action and loss run reports, which themselves fail to support cognizable claims for breach of contract.

[10] GB Group also argues in just two sentences that the good faith and fair dealing claim is precluded by either claim or issue preclusion because it was already rejected in the NC Action. We will not, however, grant GB Group relief based on such an undeveloped argument, especially when the North Carolina court described the good faith and fair dealing claim that it rejected as limited in scope. See GB v. Bulldog I, 2023 WL 9514088, at *3 (describing Bulldog's good faith and fair dealing claim as grounded on two limited sets of circumstances).

the Complaint identifies no gaps. Bulldog disputes this characterization of North Carolina law and, indeed, the primary case on which GB Group relies is a North Carolina Supreme Court decision that is applying Delaware law, not North Carolina law. See Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc., 891 S.E.2d 100, 115 (N.C. 2023) (stating that "[e]stablishing the existence of a contractual gap is essential because the 'implied covenant applies only if the contract is silent as to the subject at issue.'" (quoting MHS Capital LLC v. Goggin, C.A. No. 2017-0449-SG, 2018 WL 2149718 at *12 (Del. Ch. May 10, 2018)). We need not resolve the question as to whether North Carolina law requires a good faith and fair dealing claim to be grounded on a contractual gap, however, because even assuming *arguendo* that it does, as GB Group argues, the Complaint allows for a reasonable inference that there is such a gap here.

As explained above, Bulldog's contractual claims are grounded, in part, on allegations that GB Group provided Bulldog with inaccurate loss run reports. We have already concluded that the Complaint does not plausibly allege a breach of a contract claim based on the provision of those reports because it does not identify any term of the contract that expressly requires loss run reports to be accurate. We therefore understand Bulldog's claim that GB Group was required to produce accurate loss run reports to be based on a gap in the contractual provisions. Accordingly, even if a contractual gap is a requirement for a good faith and fair dealing claim, we conclude that the Complaint allows for a reasonable inference that there is just such a contractual gap here, and we reject GB Group's argument that the claim must be dismissed because of the absence of a gap.

GB Group also argues that we should dismiss the claim for breach of the implied covenant of good faith and fair dealing because the Complaint fails to plausibly allege that GB Group acted with "wrongful intent," citing a single North Carolina case, which states that "[a] breach of the implied covenant of good faith and dealing requires 'the wrongful intent of a party to deprive

another party of its contractual rights.'" Floyd v. On the Rox Ent. LLC, No. 5:19-cv-131-BO, 2020 WL 6049907, at *2 (E.D.N.C. Oct. 13, 2020) (quotation omitted).[11] However, that same case found a complaint's allegation that the defendant "knew or should have known" that his conduct would cause injury to be sufficient to support a claim. Id. Accordingly, GB Group has failed to cite sufficient authority to support its argument for dismissal based on the Complaint's failure to sufficiently allege wrongful intent, and we will not dismiss the good faith and fair dealing claim on that basis.[12]

For the above reasons, we reject GB Group's arguments for dismissal of the breach of the implied covenant of good faith and fair dealing claim, and we therefore deny its Motion insofar as it seeks dismissal of that claim.

3. Fiduciary Duty

GB Group argues that the Complaint fails to state a cognizable claim for breach of fiduciary duty because it fails to allege a special relationship from which a fiduciary duty could arise.

[11] Floyd purported to be quoting the North Carolina Court of Appeals in Dull v. Mutual of Omaha Insurance Company, 354 S.E.2d 752 (N.C. Ct. App. 1987). However, we could not find the quoted language in the Dull opinion. Indeed, on the page that Floyd cites as containing the language, the Dull court granted summary judgment in the defendants' favor on a claim that they had violated the obligation of good faith and fair dealing by terminating a contract, based exclusively on the fact that the contract included a provision that the contract was terminable at will. Id. at 757. The Dull court then merely observed, in dicta, that, the summary judgment record in that case also "disclosed no evidence that defendants exercised termination-at-will clause of the contract with the intent to wrongfully deprive plaintiffs of any commissions or other benefits to which they were entitled or for any other wrongful or unconscionable purpose." Id. It thus never stated that wrongful intent was an essential element of a good faith and fair dealing claim, much less that a complaint must allege such wrongful intent.

[12] In its reply brief, GB Group cites a second case in support of its wrongful intent argument, Hamm v. Blue Cross and Blue Shield of North Carolina, No. 05 CVS 5606, 2010 WL 5557501 (N.C. Super. Aug. 27, 2010). Hamm is a state trial court decision that is short on analysis and, like Floyd, questionably relies on Dull for support. See id. at *10. Thus, Hamm does not change our conclusion here.

Bulldog responds that it has adequately alleged that it and GB Group had both a *de jure* and *de facto* fiduciary relationship.

Under North Carolina law, "to make out a claim for breach of a fiduciary duty, plaintiffs must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties." Sykes v. Health Network Sols., Inc., 828 S.E.2d 467, 475 (N.C. 2019). "The list of relationships that [North Carolina has] held to be fiduciary in their very nature is a limited one . . . ." Id. at 476 (quotation omitted); Dallaire v. Bank of America, N.A.,760 S.E.2d 263, 266 (N.C. 2014) (recognizing fiduciary relationships between spouses, lawyer and client, trustee and beneficiary, and partners in a partnership (citations omitted)). "[G]eneral contractual relationships do not typically rise to the level of fiduciary relationships." Sykes, 828 S.E.2d at 476. As the North Carolina Supreme Court has clearly stated: "[P]arties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract." Id. (alteration in original) (quotation omitted)

Here, the Complaint alleges that "Bulldog and GB Group stood in a *de jure* principal-agent fiduciary relationship based on the express authority that Bulldog provided to GB Group to manage, oversee, and process all claims subject to the Agreement." (Compl. ¶ 121.) This allegation "seeks to establish a fiduciary relationship arising out of the operation of a general business relationship," "ignor[ing] th[e] principle" that "typical contractual relationships do not give rise to the special status of a fiduciary relationship." Sykes, 828 S.E.2d at 476. We therefore reject Bulldog's contention that the express authority that it granted to GB Group pursuant to the Agreement created a *de jure* fiduciary relationship.

The Complaint alternatively asserts that GB Group "owed a *de facto* fiduciary duty to Bulldog based on GB Group's unique and superior position as the party directly managing and

processing claims, along with its discretion to exercise control over the disposition of certain actions and duties under the Agreement." (Compl. ¶ 122.) However, again, GB Group's managing and processing of claims under the terms of the Agreement, and any discretionary control that GB Group exercised in connection with its "actions and duties under the Agreement," are merely the hallmarks of a typical contractual relationship and are in no way reflective of a separate fiduciary relationship that would give rise to separate legal duties. The Complaint alleges no fact that give rise to a reasonable inference otherwise. We therefore conclude that Bulldog has failed to allege a fiduciary relationship that can give rise to a plausible claim for breach of fiduciary duty, and we grant GB Group's Motion insofar as it seeks dismissal of the breach of fiduciary duty claim.

4. Negligence

GB Group moves to dismiss Bulldog's negligence claim, which asserts that GB Group negligently performed its contractual obligations, arguing that the claim is precluded by the economic loss rule. "The economic loss rule, as it has developed in North Carolina, generally bars recovery in tort for damages arising out of a breach of contract." Rountree v. Chowan Cnty., 796 S.E.2d 827, 830 (N.C. Ct. App. 2017). "A tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." Id. (quotation omitted). As a result, a plaintiff seeking "[t]o pursue a tort claim and a breach of contract claim concerning the same conduct . . . must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract." Kelly v. Georgia-Pacific, LLC, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (quotation and citations omitted). Moreover, this "independent tort exception" has been "carefully circumscribed," Strum v. Exxon Co., 15 F.3d 327, 331 (4th Cir. 1994), with "North Carolina

courts . . . striv[ing] to keep tort and contract law . . . within their separate spheres," Kelly, 671 F.Supp.2d at 791 (citation omitted). Ultimately, "[i]f the alleged tortious conduct arises from performance of or failure to perform a contract, . . . then the tort does not constitute an 'independent tort,' and the economic loss doctrine bars the tort claim." Blackman v. Boston Whaler, Inc., 649 F. Supp. 3d 142, 154 (E.D.N.C. 2023) (citing ACS Partners, LLC v. Americon Grp., Inc., No. 3:09-cv-464-RJC-DSC, 2010 WL 883663, at *8 (W.D.N.C. Mar. 5, 2010)).

Here, the Complaint alleges that GB Group "negligently . . . breached . . . Article II, §§ A, F-G, J of the Agreement by . . . failing to issue reservation of rights letters, failing to follow defense counsel recommendations, failing to properly manage claims and coordinate litigation activity, and failing to decline and/or disclaim coverage." (Compl. ¶ 134.) This claim, on its face, is a claim that GB Group failed to perform as required by the Agreement and thus, is not an actionable "independent tort." See Further Festivals, LLC v. Etix, Inc., No. 5:23-cv-00676-D, 2024 WL 1546919, at *7 (E.D.N.C. Apr. 9, 2024) (finding no allegation of independently tortious conduct and dismissing negligence claim where both negligence and contract claims alleged that defendant had breached a duty to sell tickets and provide tickets to purchasers); Martin v. Bimbo Foods Bakeries Dist., LLC, No. 5:15-cv-00096-BR, 2015 WL 1884994, at *6 (E.D.N.C. Apr. 24, 2015) (finding that economic loss rule barred plaintiff's negligence claim where negligence claim arose out of defendant's performance of contractual duties such that "any duty" owed was "contractually-based" and negligence claim was not "independent of" the plaintiff's breach of contract claim).

In arguing that that we should not dismiss its negligence claim on this basis, Bulldog asserts that its claim "arises not solely from GB Group's breach of its duties under the . . . Agreement, but also [from GB Group's breach of] the duties it owes Bulldog as a professional in the industry of

third party administration." (Bulldog Mem. at 27 (citing Compl. ¶¶ 2, 13, 36, 48, 50, 93 130).) However, any such duty to perform contractual obligations in conformance with industry and/or professional standards is simply not "separate and distinct from any duty owed under a contract." Kelly, 671 F. Supp. 2d at 791; Braswell Egg Co., Inc. v. Poultry Mgmt. Sys., Inc., 481 F. Supp. 3d 528, 543 (E.D.N.C. 2020) (concluding that contracting party's duty to act "with the skill of an ordinary, prudent, and reasonable person" was not "separate and distinct" but rather, was "part and parcel" of the party's contractual duty (citing Kelly, 671 F. Supp. 2d at 792)). We therefore conclude that GB Group's alleged duty to act in accordance with unspecified industry and/or professional standards cannot support a separate and independent negligence claim under the circumstances presented.

Bulldog also argues that the economic loss rule does not apply here because the rule only "prohibits recovery for purely economic loss in tort" and here, GB Group's conduct "implicates reputational harm." (Bulldog Mem. at 27 (citing Lord v. Customized Consulting Specialty, Inc., 643 S.E.2d 28, 30 (N.C. Ct. App. 2007).) The only suggestion of reputational harm in the Complaint, however, is an allegation that Bulldog's insured in the Martinez action "lost credibility in the eyes of the jury due to GB Group's failure" to send it a preservation letter. (Compl. ¶ 93.) The Complaint does not allege, or even suggest, that Bulldog itself has suffered any reputational harm. We thus reject Bulldog's assertion that the Complaint contains an implication of reputational harm that could bar the application of the economic loss rule. Under these circumstances, we grant GB Group's Motion insofar as it seeks dismissal of Bulldog's negligence claim pursuant to the economic loss rule.

## IV. CONCLUSION

For the foregoing reasons, we grant GB Group's Motion insofar as it seeks dismissal of Bulldog's breach of contract, breach of fiduciary duty, and negligence claims for failure to state claims upon which relief can be granted pursuant to Rule 12(b)(6). We deny the Motion insofar as it seeks dismissal of the claim for breach of the implied covenant of good faith and fair dealing.[13] An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

____________________________

John R. Padova, J.

---

[13] GB Group asks us to strike Bulldog's claim for punitive damages in connection with this claim, citing N.C. Gen. Stat. § 1D-15(d), which states that "[p]unitive damages shall not be awarded against any person solely for breach of contract." However, Bulldog's prayer for relief in connection with its claim for breach of the implied covenant of good faith and fair dealing does not request punitive damages. (Compl. at 18 ¶ (b).) Thus, there is no punitive damages claim to strike.